The **TRAVELERS INDEMNITY COMPANY**, a body corporate, Plaintiff,

**Martin C. Mareiniss, James E. Masterson,** and **Joseph F. Walsh,** as Co-Trustees in the pending **Chapter XI** Proceedings of **Carnell Construction Corp.,** Intervening Plaintiffs,

v.

The **FIRST NATIONAL STATE BANK OF NEW JERSEY,** a national banking corporation, and **Robert C. Weaver,** Secretary of Housing and Urban Development, an Executive Department of the United States of America, Defendants.

**Civ. A. No. 292–68.**

United States District Court, D. New Jersey. June 16, 1971.

Lum, Biunno & Tompkins, by Charles Hoens, Jr., Newark, N. J., for Travelers Indemnity Co.

Martin C. Mareiniss, James E. Masterson, Joseph F. Walsh, by John J. Bracken, Newark, N. J., cotrustees for Carnell Const. Corp.

Bertram M. Light, Jr., Newark, N. J., for First Nat. State Bank of New Jersey.

Herbert J. Stern, U. S. Atty., by Carolyn N. Arch, Asst. U. S. Atty., for Secretary of Housing and Urban Development.

## OPINION

WORTENDYKE, District Judge:

Upon appropriate cross motions for summary judgment and upon a written stipulation of facts entered into by counsel for the respective parties, the claims between the parties have been submitted to the Court and decision thereon reserved at the conclusion of the oral arguments on the motions. Since that stipulation has been filed only a brief review of the facts will be necessary. This case involves the same housing project as described in United States v. Munroe Towers, Inc., 286 F.Supp. 92 (D.N.J. 1968).

The intervening plaintiffs are co-trustees in Bankruptcy for Carnell Construction Corp. (formerly DeMatteis International Construction Co., and hereinafter Carnell). The plaintiff Travelers Indemnity Company (Travelers) is a surety company that issued a Dual-Obligee Bond on behalf of the general contractor Carnell to guarantee the performance of the Construction Contract (Exhibit D). During the construction period Munroe Towers, Inc. (Munroe) was the owner of real property situate in Asbury Park, and the owner-mortgagor of the building erected thereon, and the defaulting mortgagor under a $4,174,500.00 construction mortgage, on which the defendant First National State Bank of New Jersey (Bank) is the mortgagee. The Bank assigned the mortgage to the defendant Robert C. Weaver, Secretary of Housing and Urban Development (Secretary) on October 4, 1966 in accordance with the provisions of the National Housing Act, Title 12 U.S.C. § 1713(g) and 24 C.F.R. § 207.258. The Secretary had insured the said mortgage.

At various times during the period in question, the parties executed numerous documents and agreements. These documents and agreements are set out in Schedule A attached hereto. In addition to the documents described in Schedule A, certain other documents are incorporated in the stipulation of facts (without specific reference). These are delineated in Schedule B.

Defaults in mortgage interest payments occurred during construction, when the building was near completion and the mortgage was assigned to the Secretary. Thereafter, the general con-

tractor, Carnell, completed construction of the Munroe project.

Subsequent to October 4, 1966 the construction project was accepted by the owner-mortgagor, Munroe, with the approval of the Secretary and of the Bank. At the time of acceptance all improvements had been completed. On October 29, 1966 the United States of America as insurer and assignee of the mortgage loan filed a complaint in this Court to foreclose the said mortgage.

Travelers has paid the sum of $262,-833.29 to materialmen and suppliers of Carnell in connection with the work performed on the Munroe Towers project. An additional claim of a subcontractor, Melrose Electric Company, has been settled for the sum of $25,000 upon payment of which the total of payments made under Travelers' bond will reach the sum of $287,833.29.

The various plaintiffs' complaints are substantially similar in the variety and number of legal theories of liability asserted. The substance of the controversy would seem to be who is entitled to certain funds formerly held by the Bank and now in the possession of the Secretary as its assignee. These funds were retainages and escrow deposits required by Title 12 U.S.C. § 1713(g) (4) and (5) to be remitted to the Secretary in conjunction with an assignment to him.

Plaintiffs allege in their complaints in this action that, due to the failure of the Bank to give the requisite notice of default of Munroe Towers and to release the funds due and owing to Munroe and Carnell, contractor Carnell was unable to make payments to its creditors, including labor and material subcontractors in connection with the project, and that on or about April 15, 1967 a petition for arrangement under Chapter XI of the Bankruptcy Act, 11 U.S.C. § 701 et seq. was filed in behalf of Carnell and is still pending. Plaintiffs further allege that upon the default of Carnell in payment of its job creditors the surety became obligated to satisfy the claims of all persons having contracts directly with Carnell for labor and material furnished in connection with the construction of the project. Plaintiffs further charge that as a direct result of the Bank's failure to notify Carnell of the default of Munroe and to release the funds, plaintiff Travelers has been presented with numerous claims under its Bond and has been compelled to and will be compelled to make payments to various claimants. Therefore Travelers alleges that by virtue of said payments and claims it has become, as surety upon its Bond, subrogated to the rights of Carnell and the laborers and materialmen on the project.

Plaintiffs also allege that the monies which the Bank failed to release were trust funds for the benefit of Carnell and the laborers and materialmen on the project which were diverted by the Bank in an amount of $409,897.25 for which it claims recovery from the Bank and the Secretary of Housing and Urban Development as their respective liabilities may appear.

■ Although the parties did not discuss this suit as one substantially grounded in contract, we so view it. This Court deems the plaintiffs to be creditor third party beneficiaries of the building loan agreement, and the Secretary to be the assignee of the said agreement. The various pertinent statutes, regulations and agreements set up an elaborate system enabling the mortgagee to retain a portion of the funds payable under the building and loan agreement to insure the mortgagor's performance of his obligation to erect the project; upon completion of the project the disposal of the funds is also provided for. These various statutes and regulations and the building loan agreement are incorporated into the mortgage; accordingly when the mortgage was assigned so were the rights and duties arising under it as well as those arising under incorporated agreements.

■ Jurisdiction over the Secretary is vested in this Court by virtue of

Title 12 U.S.C. § 1702 which in pertinent part provides:

"The Secretary shall * * * be authorized in his official capacity, to sue and *be sued* in any court of competent jurisdiction, State or Federal." [emphasis added]

This Court's jurisdiction to entertain a suit on an express contract is not limited by the Tucker Act, Title 28 U.S.C. § 1346, as settled by Ferguson v. Union National Bank of Clarksburg, W. Va., 126 F.2d 753 (4 Cir. 1942). See also George H. Evans and Co. v. United States, 169 F.2d 500 (3 Cir. 1948); Seven Oaks v. F. H. A., 171 F.2d 947 (4 Cir. 1948). Diversity jurisdiction is the basis for the claim against the defendant Bank. 28 U.S.C. §§ 1332 and 1348.

■■■ The law governing the parties' particular relationship to the bilateral building loan agreement is federal. See Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943); United States v. Allegheny County, 322 U.S. 174, 64 S.Ct. 908, 88 L.Ed. 1209 (1944). We will therefore disregard all of the State law cited by the respective parties.

On July 17, 1964 the Bank and Munroe executed various agreements one of which was a bilateral executory contract, a building loan agreement (Exhibit C), whereby the Bank became obligated to extend credit in the form of a loan in the aforesaid amount to be secured by a mortgage and note, and Munroe became obligated to erect the aforesaid project. In addition to these covenants, the contract, in pertinent part, provides:

"(4) * * * Upon completion of the improvements * * * the balance due the Borrower hereunder shall be payable upon the expiration of 30 days from the date of final completion and acceptance of the project by the Lender with the approval of the Commissioner * * *.

(5) * * * and the Borrower covenants that it will receive all advances hereunder as a trust fund to be applied first for the purpose of paying for the cost of the improvements before using any part of the total of the same for any other purpose, but nothing herein shall impose upon the Lender any obligation to see to the proper application of such advances by the Borrower.

*   *   *   *   *   *

(10) If the Borrower at any time prior to the completion of the project abandons the same or ceases work thereon for a period of more than twenty (20) days or fails to complete the erection of the project strictly in accordance with the Drawings and Specifications, except as to changes approved herein provided by the Lender and the Commissioner, or make changes in the Drawings and Specifications without first securing written approval of the Lender and the Commissioner, or otherwise fails to comply with the terms hereof, any such failure shall be a default hereunder, at the option of the Lender, and the Lender may terminate this agreement, or the Lender, at its option, at any time thereafter may enter into possession of the premises and perform any and all work and labor necessary to complete improvements * * *. The Borrower hereby assigns and quit claims to the Lender all sums unadvanced under said mortgage and all sums due in escrow *conditioned upon the use of said sums in trust for the completion of the project, such assignment to become effective only in case of the Borrower's default.*

*   *   *   *   *   *

(13) Any 'holdback' shall be payable upon completion of the entire project * * * to the satisfaction of the Lender and the Commissioner * * *.

(14) * * * As used in this instrument, the term 'Lender' shall be deemed to include any person to whom the note hereinbefore mentioned and the mortgage securing the same shall be assigned with the consent of the Commissioner, and *this instrument shall be binding upon the parties hereto and their respective successors and assigns."* [Emphasis added.]

The clauses numbered four and thirteen above embody the mortgagee's obligation to pay the mortgagor the "balance due" or "holdback" after project completion. The second quoted paragraph purports to impress a trust on funds received by the mortgagor without specifically binding the mortgagee to supervise the application of payments out of the trust res. Upon the default of the mortgagor, clause ten provides the mortgagee with alternative courses of action, termination of the agreement or completion of the project. The provisions of this paragraph necessitate the mortgagor's relinquishing a claim to any unpaid sums and retainages that are expended by the mortgagee after his election to undertake completion of the project. On our facts, the mortgagee elected neither alternative, since the project had been substantially completed, and stood idly by as the project's completion was effectuated.

The last quoted paragraph above indicates that any assignee will be bound by the respective duties and obligations agreed to by the mortgagor and the mortgagee, and appears to define the term "lender" so as to include acceptable assignees of the mortgage and note, presumably the defendant Secretary when the mortgage has been assigned to him.

Nothing in the above decribed agreement contravenes or modifies the basic regulatory obligation of the Bank and its assigns to extend the full amount of credit under the building loan agreement where there has been no notice of termination of the project and the project has been satisfactorily completed.

The said regulatory obligation is embodied in 24 C.F.R. § 207.3(b):

"The mortgagee shall be obligated, as a part of the mortgage transaction, *to disburse the principal amount of the mortgage, to, or for the account of the mortgagor or to his creditors for his account and with his consent."* [Emphasis added.]

In addition to this duty being extended to the assignee Secretary by the express terms of the assigned building loan agreement it is imposed by the definition of "mortgagee" embodied in Title 12 U.S. C. § 1707(b) and 24 C.F.R. § 207.251(g). Title 12 U.S.C. § 1707(b) provides:

"The term 'mortgagee' includes the original lender under a mortgage, and his successors and *assigns approved by the Secretary*; and the term 'mortgagor' includes the original borrower under the mortgage and his successors and assigns." [Emphasis added.]

The contention that this clause could be construed so as to exclude the Secretary once the mortgage has been assigned to him is unwarranted. We therefore hold to the contrary. This definition is incorporated into the contract by implication. In Von Hoffman v. Quincy, 4 Wall. 535, 71 U.S. 535, 18 L.Ed. 403 (1866) the Supreme Court dealt with incorporation by implication:

"It is also settled that the laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as if they were expressly referred to or incorporated in its terms." *Id.* at 550.

In accord with this proposition are Northern Pacific Ry. Co. v. Wall, 241 U. S. 87, 36 S.Ct. 493, 60 L.Ed. 905 (1916), United States v. Essley, 284 F.2d 518 (10 Cir. 1960) and Battaglia v. General Motors Corp., 169 F.2d 254 (2 Cir. 1948), cert. den. 335 U.S. 887, 69 S.Ct. 236, 93 L.Ed. 425 (1948).

Although the above quoted Supreme Court language has been refined by time, its essence would appear to be at least

as stated in 3 Corbin, on Contracts 198 (1963):

> "[T]he process of interpretation and determination of legal operation are almost always carried on together. Since different legal effects will usually follow different interpretations, this fact often plays an important part in the choice of one interpretation over another. Indeed, it is always true that words and other symbols must be interpreted in the light of the surrounding circumstances; and the existing statutes and rules of law are always among these circumstances." [footnote omitted]

Moreover, the question of whether statutory regulations are incorporated into the parties' contractual undertakings was dealt with and answered affirmatively in Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947). See also Fed. Housing Adm. v. Morris Plan Co. of Calif., 211 F.2d 756 (9 Cir. 1954).

■ Absent the express language in the building loan agreement, and the aforementioned regulations, we would still be constrained to hold that the plaintiffs have rights against the Secretary because of elementary principles of contract law. Without an agreement to the contrary, an assignment is operative to convey to the assignee the right to any security posted by the obligor, who, on our facts, would be the mortgagor and would be entitled to the return of the funds, had he performed all of his contractual obligations and duties. Although the assignment normally does not discharge an assignor of his duties under an assigned bilateral contract, S. S. Kresge Co. v. Sears, 87 F.2d 135 (1 Cir. 1936), we feel that the Bank's compliance with the statutory mandate embodied in Title 12 U.S.C. § 1713(g) (4) and (5) would constitute an affirmative defense to suit since the plaintiffs at least have enforceable rights against the assignee Secretary. See Art Metal Const. Co., etc. v. Lehigh Structural Steel Co., 116 F.2d 57 (3 Cir. 1940). In the *Art Metal Case*, the Court dealt with the basic doctrines surrounding an obligor's rights under an assigned contract, quoting the Restatement of Contracts, § 164:

> "(1) Where a party to a bilateral contract which is at the time wholly or partially executory on both sides, purports to assign the whole contract, his action is interpreted, in the absence of circumstances showing a contrary intention, as an assignment of the assignor's rights under the contract and a delegation of the performance of the assignor's duties.
>
> (2) Acceptance by the assignee of such an assignment is interpreted, in the absence of circumstances showing a contrary intention, as both an assent to become an assignee of the assignor's rights and as a promise to the assignor to assume the performance of the assignor's duties."

Construing the basic rights of the parties in the context of their agreements, incorporating by implication the pertinent statutes and regulations, we hold these agreements, statutes and regulations to be evidence of the intent to bind the assignee-secretary to the obligation to extend the full amount of credit and to make the appropriate payments to the mortgagor or his creditors, out of the transferred fund of monies. Likewise, the Bank's compliance with the statutory mandate and the Secretary's acceptance of these funds constitutes a valid defense to suit herein.

■ It is this Court's determination that the plaintiffs herein fall within the ambit of those parties entitled to sue. When the term "creditors" from 24 C.F.R. § 207.3(b) is taken in its every day meaning the general contractor's trustees and his surety would be creditors. The bankrupt general contractor has constructed the project for the mortgagor and has not been paid the amount due under the cost plus construction contract (Exhibit D). In light of the scope

of the powers vested in the "trustee" by Title 11 U.S.C. § 110 we do not believe it could seriously be contended that the co-trustees cannot sue for and on behalf of the bankrupt and its lien creditors:

"(a) The trustee of the estate of a bankrupt * * * shall in turn be vested by operation of law with the title of the bankrupt as of the date of the filing of the petition * * * to all of the following kinds of property wherever located * * * (5) property, including rights of action, which prior to the filing of the petition he could by any means have transferred or which might have been levied upon and sold * * * (6) right of action arising upon contracts, or usury, or the unlawful taking or detention of or injury to his property * * *."

Clearly, the co-trustees would be creditors of the mortgagor by virtue of any choses in action related to the construction contract having accrued to them. In holding the trustees to be "creditors" we have only considered those portions of 24 C.F.R. § 207.3(b) after the second conjunction and have not interpreted the phrase "for the account of the mortgagor." Nevertheless, were we called upon to do so, we would hold that third party rights could arise by virtue of the uninterpreted clause. The surety is one more step removed. But it is now well settled that a surety who pays the debts of his principal is entitled to be subrogated to the extent required for reimbursement and may avail itself of all rights of the principal, Henningsen v. United States Fidelity and Guaranty Company, 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547 (1908), as well as the rights of the laborers and materialmen it has paid, National Surety Corp. v. United States, 133 F.Supp. 381, 132 Ct.Cl. 724 (1955). Although some confusion arose concerning the rights of a surety following the decision in United States v. Munsey Trust Company, 332 U.S. 234, 67 S. Ct. 1599, 91 L.Ed. 2022 (1947), the Su-preme Court in Pearlman v. Reliance Insurance Company, 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962) clearly recognized and reaffirmed the basic rights of a surety. Although a surety's claim may be equitable in origin, it is nonetheless a creditor's claim.

The second reason for deeming the contractor's trustees and surety to be creditor third party beneficiaries is the existing federal case law on the subject of third party beneficiaries. On our facts the mortgagor was at least in part acting as his own surety in that the mortgagor permitted the mortgagee to withhold retainages in accordance with 24 C.F.R. § 207.19(c) (6). In other suretyship problems arising under federal statutes, it has been held that legislative intent is the guiding determinant of those parties who may or may not sue as a third party beneficiary. In Howard v. United States, 184 U.S. 676, 22 S.Ct. 543, 46 L.Ed. 754 (1901) when a suit was instituted on a bond required in conjunction with a federal employment contract, the Court held that the statute's intent governed those classes of persons entitled to assert a claim on the statutorily required bond and that the usual criterion for determining whether or not a party was a third party beneficiary, the intent of the parties at the time the agreement was negotiated, was not controlling. On our facts there is a minor distinction from the *Howard* bond. In *Howard*, the bond was required by statute, while here the de facto suretyship agreement was required by legislative, and not administrative, regulations. Nevertheless, we do not deem such a difference to be fatal to the plaintiffs' theory of recovery. Here the building and loan agreement with its de facto suretyship provisions was required by 24 C.F.R. § 207.19(c), promulgated under the authority of Title 12 U.S.C. § 1703 (h).

In making the determination that the plaintiffs have enforceable rights we are guided by cases arising under the Miller Act, 40 U.S.C. § 270a et seq., in absence of a more conclusive manifestation of

legislative intent. *Pearlman, supra,* involved a suit under the said Act. Therein the Court concluded (371 U.S. p. 141, 83 S.Ct. p. 237):

> "We therefore hold in accord with established legal principles stated above that the Government had a right to use the retained fund to pay laborers and materialmen: that the laborers and materialmen had a right to be paid out of the fund; *that the contractor, had he completed his job and paid his laborers and materialmen, would have become entitled to the fund; and that the surety, having paid the laborers and materialmen, is entitled to the benefit of all these rights to the extent necessary to reimburse it.*" [Emphasis added and footnote omitted.]

We therefore hold that the plaintiffs herein are entitled to payment out of the retainages transferred to the defendant Secretary. In so holding we have not construed the Miller Act and the National Housing Act *in pari materia* but simply have held that the co-trustees in Bankruptcy and the surety were entitled to sue as creditor third party beneficiaries by virtue of their "creditor" status under 24 C.F.R. § 207.3(b).

■ If the United States Government, or any branch thereof, enters into a contract with an individual and does so in its private or business capacity and not as a sovereign, it submits itself to the same rules of law which govern the construction of contracts between individuals. S. R. A., Inc. v. Minnesota, 327 U.S. 558, 66 S.Ct. 749, 90 L.Ed 851 (1946); Reading Steel Casting Co. v. United States, 268 U.S. 186, 45 S.Ct. 469, 69 L.Ed. 907 (1925).

■ In a case such as this, where the governmental agency is acting in a commercial field, with the full authority and consent of Congress, that agency should not be less amenable to the ordinary rules of law than would be a private enterprise under like circumstances. Keifer and Keifer v. Reconstruction Finance Corp., 306 U.S. 381, 59 S.Ct. 516, 83 L.Ed. 784 (1938); Federal Housing Administration v. Burr, 309 U.S. 242, 60 S.Ct. 488, 84 L.Ed. 724 (1940).

■ The various parties have argued that the Fifth Article of the Construction Contract (Exhibit D) is controlling. This Court does not agree. Article Twelve of the Mortgage (Exhibit K) is the relevant provision whereby the assignment of the building loan agreement is provided for:

> "The funds to be advanced herein are to be used in the construction of certain improvements on the lands herein described, in accordance with a building loan agreement between the mortgagor and the mortgagee, dated June 17, 1964, *which building loan agreement* (except such part or parts thereof as may be inconsistent herewith) *is incorporated herein by reference to the same extent and effect as if fully set forth and made a part of this mortgage * * *.*" [Emphasis added.]

This article specifically provided for incorporation by reference. The assignment of the mortgage (Exhibit FF–1) therefore brought about an assignment of the building loan agreement and was the conduit for the duties and obligations concomitant thereto.

Nevertheless, the aforementioned Fifth Article is relevant to the controversy at bar in that it delineates the obligations of the owner-mortgagor vis-a-vis the contractor. Article 5 of the same Construction Contract provides that:

> "The Contractor understands that the work herein provided to be done is to be financed by a building loan secured by a mortgage to be insured by the Federal Housing Commissioner, the terms of which are set forth in a Building Loan Agreement between the Owner as Borrower, and the National State Bank of Newark [now the First National State Bank of New Jersey], as Lender. *The Contractor, in the event of the failure of the Owner to perform its obligations to the Lender under said Building Loan Agreement, shall, upon receipt of written notice from the Lender that it has elected not to proceed with the work, immediately cease performance of this Construction Contract and all its obli-*

*gations thereunder, and this Contract shall terminate upon receipt by the said Contractor of said notice.* In such event, provided the Contractor is not in default under this Construction Contract, the Contractor may, within fifteen (15) days after receipt of such notice, submit directly to the Lender an application for advances to pay claims for work done and materials furnished up to the time such written notice was received by the Contractor as aforesaid, and the Contractor shall be entitled to receive such amount as may be approved by the Federal Housing Commissioner and the Lender to be paid to the Contractor as and for the value of such work and materials." [Emphasis added.]

Had the Bank given the requisite notice provided for in the construction contract, the plaintiffs would not be entitled to assert any claim for monies due and owing for work performed after the notice. But since the building project had been substantially completed at the time of mortgagor's default we assume that any sort of notice giving would have been an exercise in futility. Presumably this is the reason for the absence of any notice of termination.

In summary, Judgment will be entered against the Secretary and in favor of the plaintiff Travelers in the sum of $287,833.29 and in favor of the plaintiff co-trustees in the sum of $122,063.96 plus lawful interest.

Accordingly, an Order may be presented in accordance with the views expressed in the above opinion.

### SCHEDULE A

| | DOCUMENT | DATE(s) | EXHIBIT |
|---|---|---|---|
| 1. | Application for Mortgage Insurance | 2/4/63 | A |
| 2. | Secretary's Commitment Letter | 5/1/63 | B |
| 3. | Secretary's Amended Commitment Letter | 2/18/64 | B–1 |
| 4. | Mortgage Note | 7/17/64 | J |
| 5. | Mortgage | 7/17/64 | K |
| 6. | Carnell's Application to Travelers For Contract Bond | 7/17/64 | L |
| 7. | Contractor's Requisitions, Nos. 1–18 | | M(1–18) |

| | DOCUMENT | DATE(s) | EXHIBIT |
|---|---|---|---|
| 8. | Applications For Insurance Of Advance Mortgage Proceeds, Nos. 1–20 | | N(1–20) |
| 9. | Applications for Insurance of Advance Mortgage Proceeds, Nos. 21 and 22 | | O |
| 10. | Notices of Default | | P, S, and Z |
| 11. | Transmittal From Newark F.H.A. Office Director | 4/28/66 | R |
| 12. | Transmittal Resubmitting Application For Insurance of Advance No. 22 | 5/16/66 | T |
| 13. | F.H.A. Letter Reallocating Finance Charges Plus Interest | 5/19/66 | U |
| 14. | Contractor's Requisition No. 19 | 5/25/66 | V |
| 15. | Application for Insurance Advance No. 23 | 5/18/66 | W |
| 16. | Approval for Advance No. 23 by F.H.A. | 5/25/66 | X |
| 17. | Bank's Request for Thirty Day Extension of Time to Elect to Assign or Foreclose Mortgage | 5/31/66 | Y |
| 18. | F.H.A. Letter Relative to Thirty Day Extension | 6/10/66 | AA |
| 19. | Bank Notification of Election of Assignment | 6/13/66 | BB |
| 20. | F.H.A. Acknowledgment of Election of Assignment | 6/28/66 | CC |
| 21. | Bank Transmittal Enclosing $521,715.05 consisting of: Undisbursed Mortgage Proceeds $450,051.00 Working Capital $32,388.71 Organization of Fee Escrow $39,275.34 | 10/4/66 | DD |
| 22. | Check for $521,715.05 | 10/4/66 | EE |
| 23. | Mortgage and Note Assignment | 9/16/66 | FF(1–2) |

### SCHEDULE B

| | DOCUMENT | DATE(s) | EXHIBIT |
|---|---|---|---|
| 1. | Building Loan Agreement | 7/17/64 | C |
| 2. | Cost Plus Construction Contract | 7/17/64 | D |
| 3. | Contract Bond—Dual Obligee | 7/17/64 | E |
| 4. | Mortgagor's Certificate | 7/17/64 | F |
| 5. | Mortgagee's Certificate | 7/17/64 | G |
| 6. | Mortgage Insurance Agreement | 7/17/64 | H |
| 7. | Application For Insurance of advance Mortgage Proceeds | 4/22/66 | Q |
| 8. | Cover Letter for Application For Insurance of Advance No. 23 | 5/18/66 | W 1 |